We're ready to hear the first case, PHOTO v. Meta Platforms. Good morning, and may it please the court. The district court here properly recognized that what is necessary to start the limitations period is for there to be reason to suspect the probability of wrongdoing. For example, that's laid out in the district court's opinion in pages 203 to 204 of the appendix. But it instead held the appellant PHOTO to a standard amounting to speculation. PHOTO did not discover, should not have known during the relevant period, and Meta indeed affirmatively concealed that Meta was suppressing photo-related content. PHOTO filed its action here in a timely fashion, but not, not when it would have been improvident, speculative, or inconsistent with ethical or pleading obligations to do so. And that, I submit, is exactly what should be expected of private antitrust litigants, in the interest of manageable dockets and of well-founded cases. And there are- But what was the affirmative concealment? What did Meta do to conceal the wrongdoing? Certainly, Judge Chin, Meta affirmatively spoke by issuing a press release when it changed the algorithm and indicated, and it set forth, in fact, in our brief and specifically in the complaint, that the order of posts would be determined by the interest of the viewer in the content. That would have been, what, March of 2016, the press release? The press release, yes. Yeah. Don't you need to find something that occurred within the four years prior to suit? I mean, the timing, you have to show some affirmative concealment later or not? Well, Meta never retracted that press release, Your Honor. And Meta, in fact, continued, continued all the way up until 2018, and in fact, later, to indicate that it didn't- What I'm asking is, were there any affirmative steps taken after that to conceal the anti-competitive content? Well, Your Honor, the press release remained extant throughout the entire period up until, up until FOTO discovered how, in fact, the algorithm was suppress- that, in fact, the algorithm was suppressing the content. You also argue that this is a context in which it's a self-concealing algorithm. Could you address that for a moment? I can. Your Honor, Judge Livingston, the concept of self-concealing, those of us who practice antitrust usually see it in the context of cartel cases, not so often in Section 2 cases. But the Hendrickson Brothers case does not limit self-concealing to those types of circumstances. And here, where in fact the nature of the algorithm is that it's concealed, it's secreted from the public, there's no way to know effectively how it operates. It's, in essence, the prototypical black box. It does seem to fit within the four corners of the Henderson case. Now, your adversary says that if your client simply looked at its own Instagram feed in April of 2016, it would have discovered precisely what it discovered in October of the following year. Could you address that? I mean, there were some warnings. Your client may have, and I'm thinking about diligence now. Your client may have had some reason to worry that Metta was suppressing its content. And why couldn't it have done what it did in October and April? Sure, I think there's two questions there, Judge Livingston. And I'll turn to the warnings, the storm warnings in a moment. But with respect to whether it could have, in fact, done what it did in October of 2017, in April of 2016, it could not have. That was, it was not, it was not an experiment, if you will, a controlled experiment of some kind. It was simply an attempt to link two groups of users. One would need to have two communities of users in order to do that, number one. And number two, one would have to discern the enormous disparities in views that happened. In one instance, with 36 versus 100, when in fact, it should have been 500 times the number of views. So it's an enormous disparity to look at there. And that's not something, that's not something that- Photo knew of the disparity, I guess, April of 2016? No, it didn't. This happened by happenstance in October of 2017. That was the attempt to link the hypno and the photo communities. It noticed a decline in new registrations, I gather. The decline in new registrations could have been due to any number of things. And in fact, we identify everything that photo did. Certainly not all the things that it considered and ruled out. But they looked to see, when you have a change in code, as was a change in the algorithm, whether the app was functioning differently, that's in paragraphs 91 to 92 of the complaint. Whether there were interactions with new features, for example, the new Android version that had been introduced just a short time before, paragraph 76. Geographical declines in usage, paragraph 196, cyclical declines in usage, paragraph 93, changes in user preferences, and even competition with Boomerang. And I do want to return to Judge Livingston's question, which was the concept of storm warnings. Each of those instances that was cited by the district court, and this is where I think the district court lost its way in viewing those as storm warnings. It's easy to do that in 2021 when we filed the complaint, when I had the benefit of seeing the Attorney General's complaint versus Meta. And knowing what we know now. In 2016, there was no reason for them to attribute, and specifically with respect to the conduct that you inquired about, Judge Livingston, any competitive attempt. And most importantly, Boomerang, for example, the release of the clone is a classic, and in fact, Meta pleads this, Meta alleges this, relying upon the Spectrum Sports case, is the essence of competition to release a copy. It was only with the benefit of seeing how, in fact, the algorithm was working to suppress the content. And later by seeing the internal meta document that was unsealed after the briefing occurred in this case, in fact, in July, it was clear that Boomerang was in fact being released not for a competitive purpose, but as the Supreme Court said in Trinco, not out of competitive zeal, but for any competitive intent. I want to stop here, I don't have much time left, but I'm intrigued by what you said about the October 2017 situation. You said that the folks at Photo couldn't have done that in April of 2016? Judge Wesley, they- They had the two different kinds of apps at that time, didn't they? They didn't have, Judge Wesley, any reason at that point, any evidence to do so. They had a reason, their new users dropped precipitously. They dropped 30 points or 30 slots on their app rating. So they saw right away, that's your point, that they saw right away something was going on, but they couldn't figure out why or what was going on. But then one of the principals runs this kind of, he goes to distribute this information in October across users of another app that they've created. And he sees that the photo feed kind of just disappears, and he claims that it disappears and there's that vast disparity between responses that he gets. And from that he deduces that somehow that algorithm that was introduced in April of 2016 acted as a filter against photo users, right? I mean, that's the theory, right? It was plausible, yes. And so in response to the Chief's question, you said, well, it couldn't have been done then back in April because, and I was having trouble following what you're saying. Could you explain that a little bit more for us? The reason it was done by happenstance, Judge Wesley, it was not done as an experiment, relying upon how the app- I understand it wasn't done as an experiment, but what I want to know is why couldn't it have been done in April of 2016? I mean, he finds this out. I mean, you're right, he wasn't trying to figure out something. But he did something for another purpose that suddenly gave him what he thought was an aha moment. That's right? Yes? Correct. What was that capable of being done in 2016? If you had the two communities of users, it was capable of being done, Your Honor. The best answer that I can give to you is that it's not something reasonable to expect in terms of diligence. When you have three individuals who literally have invested all of their proceeds from their prior venture into photo. Shouldn't the photo folks have been doing the same thing back then that they were doing in October, which is posting on Instagram their photo photos? There's no, I would think that they'd want to be checking to make sure everything was working all along and that they would have been posting photos all along. Again, Judge Shant, it was not done as an experiment. There was no reason to expect these gross disparities. And if there had been a reason to, under the circumstances, this is not simply a question of someone sitting on his hands during the timing of the statute of limitations period. There was no reason to because things were happening negatively and they shut down operations by June. And given the drop in new registrations, given the circumstances that led to shutting down, no one just tried this to see what might be happening? That is precisely my point, Judge Chin. If there had been reason for them to do it, they would have done it. There was no evidence at all to lead them to believe that, in fact, the algorithm was suppressing the photo related content to the detriment of Instagram's own users. I know your time's up, but can I ask just one more question, Chief? Did you articulate that to the district court?  Did you articulate it in your paperwork to the district court? Did we articulate whether the- The argument you're making here is that there was no reason. The reason why this happened wasn't because we were testing something. The reason we were simply doing something else and it suddenly produced a result that led us to understand that it was being filtered. And my question to you is, was that argument made in papers to the district court? I understand your question, Judge Wesley. I believe it is. I can get you a cite. It's also very clear in the pleading. You've got rebuttal time, and if your two assistants don't help you, wait a sec, don't help you, then I'll ask the Chief to allow you to make a letter of submission to us in that regard. Thank you, Your Honor. Okay, thank you. Thank you. Chief Judge Livingston, may it please the court. The district court's opinion is correct across the board, but as you can probably tell from our brief, we think the most direct path to affirmance is to recognize that the facts alleged in Foto's complaint make clear that it was on notice of its injury no later than April 2016, when the impact of the change in Instagram's algorithm to- Well, knowing it's injured, I agree with you. I mean, it was obvious to them that the numbers were big. But how they were being injured's important too, isn't it? I mean, you know you've got cancer, but how you got it is another matter. I don't, what I would say is this. If you smoke cigarettes and you get cancer, and you know you smoke cigarettes and you get lung cancer, you could have a cause of action, even if you don't understand the mechanism that caused the- In today's world, that's true, but back in 1960, that wasn't true. So the injury alone is not enough, right? I don't agree with that, Your Honor, in this regard. If you understand the conduct and the injury, and it seems to me that that really goes- So the anti-competitive behavior doesn't have any kind of intent behind it. All it has to do is it just has, that it reduces competition. Well, recall what the nature of the claim is. The claim is that Instagram had a duty not to disadvantage the content of Foto on Instagram's feed. That's the claim. That's a meritless claim, but that is the nature of the claim. Right now, we're dealing whether it's a timely claim. Exactly. And so, if that's true, they knew in April 2016 that there had been a change to the algorithm and it disadvantaged their content. Now, let me say that there is some back and forth in their papers about whether they understood the causation. Okay, so in your view, the fact that the timing is so close and so kind of direct, the application of the algorithm, and then the numbers starting to fall, that that's enough? It's, yes, because, first of all, the district judge correctly said, this is fraudulent concealment. You need to allege it with particularity under 9B. Mm-hm. And what the district court properly recognized is that the impact of the algorithmic change was evident. The pleadings in the case make clear that the impact of the algorithmic change was evident. Now, counsel has not been clear in the papers, I think. And I've read them with care to try to understand the arguments so that I can respond to it accurately. I cannot exactly tell whether counsel is saying, we didn't understand that the fall in engagement was due to the change in the algorithm. Or whether counsel is saying, we didn't understand that the algorithm was designed in such a way deliberately to disadvantage our content. Now, neither of those arguments has merit. Because on the first one, it is clear from the pleadings that they recognized that the change to algorithmic feed caused a reduction in engagement. That's alleged in the complaint. And it just stands to reason. Remember, this is, the whole claim is that the- I'm sorry, didn't they also, though, say that they performed tests on their own app to make sure that it was working properly? And honestly, your honor, I don't understand what that has to do with anything. Remember, the question is, is this content appearing in users' Instagram feed in a way that is as prominent as they think it should? And so there's content that comes up. If the content, remember, what is alleged is that in October of 2017, he sees, the founder sees this content disappear from the feed. And I will say, Judge Wesley, I do think that it's alleged clearly in the complaint that this was a shocking, you know, this was a shocking revelation, we had no idea. But that just doesn't add up. Because if it's suppressing content in the Instagram feed, they would see it. The whole point is that there's a feed that people can see, and if the content's there, they can see it. If it's not there, they can't see it. The whole point- They should have seen that happening earlier. Either it, if it was happening, they saw it. There's not, there's no two ways about it. It's not some sort of, it's not a secret price fixing conspiracy or bid rigging conspiracy where what's going on is in a room. This is affecting the feed that people see. That's the whole point. And that change was as of April of 2016? That's the allegation. That's the allegation. Maybe I'm misunderstanding, but I'm having difficulty seeing how the plaintiff could have pled a plausible antitrust claim at that time based simply on that perception. Well, that's not the question. The question is whether the claim accrued. Everyone agrees it did. Because they had notice of the conduct and the injury. That is the adoption of algorithmic feed and that they had suffered an injury. And so at that point, the statute of limitations start to run. They have four years. They didn't learn anything after April 2020. I mean, I know that they, there's a claim that they learned something from the complaint the state's filed. I don't know what that would be. Because they're aware of all of the conduct that was directed towards FOTA. So they didn't learn anything outside the statute of limitations period. And so the question is, do they have notice of the injury such that they now need to figure out, okay, I've got four years to figure this out. And the judge properly relied also, again, this is the complaint they filed that was before the district court. They said this was the latest in a series of anti-competitive acts. That was their allegation. They said that there was acts earlier in 2015 when they were strung along and then denied the opportunity to do a business arrangement. They were denied access to certain APIs. Their hashtags were suppressed. The release of Boomerang was said to have been deliberately done to drown out press about the release of the photo algorithm on Android. That was all alleged. The district court had all those allegations before it. And then this was the latest in that series of actions. I think that also, the district court, when you look at the complaint, it's interesting because what happens is he says, shockingly, I saw this in October 2015. No idea. And if you look at the chat, it's in paragraph 109 of the complaint. The two founders are talking. And he says, I'm going to email the journalist about this. And the other says, yeah, but don't let him break it until we sue him. Really, this is the first notice that you had of that you might have an injury, and you're already talking about suing under the antitrust laws on the date that you supposedly discovered this? They saw, and they allege that they saw, the impact of the algorithm. They allege that they had been supposedly targeted over the course of this. And it's also absolutely correct, as the district court held, that Meta said nothing to conceal the possibility that they might have a claim. Yes, it's true that they said, here's how the algorithm works. But those statements that what we think is going to be of interest to you, that hardly says that here's how we're treating your algorithm. And there's no explanation as to- But wouldn't saying that we're prioritizing content based on your interest mean that you're excluding the possibility of deprioritizing content because it's connected to a competitor? I don't think it would, Your Honor. Because, again, our judgment is that, well, not necessarily based on the fact that it was a competitor, but let's say, you know, we think this photo is- We don't think people are going to be interested in that. Meta could make that judgment. So, in other words, there's every reason for photo to- If it doesn't understand how the algorithm works, and it feels that its content is being disadvantaged, why didn't it ask? And they say that the district judge was naive to suggest that they should have asked, but they did ask. Later, they went to Meta, and they had been talking to Meta. They had contacts there. They could have inquired, but they didn't. And so, you know, Your Honor, I do think that you're right to wonder why didn't they- If they didn't observe that there was an impact on the appearance of their content in the feed, it's inexplicable. Again, it's open and notorious. That's the whole point of the feed. You can see what's going on. And they would have seen what was going on in April. And if the content was being suppressed, then they seem to allege, if you look at paragraph 176 of the complaint, that's again said there, they seem to allege that the algorithm was suppressing their content. So they should have seen that. I mean, they would have seen that. And so why they were on notice of their injury at that moment, And they can't explain why they waited five years to sue? We'll hear rebuttal. Thank you, Your Honor. And I will be brief. Judge Wesley, I don't have the briefing citations, but I will look for those and submit a plain vanilla submission. Give us a yes, a one page letter a week from today. And then you obviously have a week if you want to respond. The amended complaint, I think, also makes very clear the surprise and the serendipity of the discovery in paragraphs 105, 106, and 109 through 111. Judge Livingston, you asked about the fact that what was not said, if you will, or what is certainly the converse of what was said in the press release, that information will be presented based upon the user's interest, is not a double negative, if you will, which is Meta's argument. That, in fact, Meta did not affirmatively state that photo's content would be discriminated against or would be suppressed. And I would submit that the in-ray lithium ion batteries case that we cite is really on all fours on that front. To say that there's active competition in the market, of course, does not say there may not be certain instances of price fixing going on, but you don't have to say that to fraudulently conceal. And with respect to whether they could have asked somebody at Meta, there was no designated person in terms of questions about the algorithm vis-a-vis app developers. I suppose they could have sent an email to Mark Zuckerberg and asked if, in fact, the algorithm were operating in this way. But I submit it's pretty clear that would have been a futile gesture here. And in any event, we certainly are talking, I think, about factual issues for which, candidly, the plaintiff, particularly with the particularity in this pleading, should be granted the opportunity to have discovery. Thank you both. I'll take the matter under advice. Thank you, gentlemen. Yep.